UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

DAVID SIMPSON,

                 Plaintiff,

v.                                            Case No.  5:04-cv-496-Oc-10GRJ

JO ANNE B. BARNHART,
Commissioner of Social Security,

                 Defendant.
_____/

## ORDER

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for a period of disability and disability insurance benefits. (Doc. 1.) The Commissioner has answered (Doc. 4), and both parties have filed briefs outlining their respective positions. (Docs. 15 & 16.) For the reasons discussed below, the Court finds that the Commissioner's decision is due to be **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for a period of disability and disability insurance benefits on April 9, 2001, alleging an onset date of March 31, 2001. (R. 20, 84-85, 90, 91.) His claim was denied initially and upon reconsideration. (R. 56, 59, 62.) Plaintiff requested a hearing before an Administrative Law Judge, which was held on October 22, 2003. On August 10, 2004, following the hearing, Administrative Law Judge James R. Ciaravino (the "ALJ") issued a decision unfavorable to Plaintiff. (R. 10-15.) Plaintiff's

request for review of that decision was denied by the Appeals Council on September 15, 2004, rendering the ALJ's decision the final decision of the Commissioner. (R. 3-5.)

## II. ISSUES PRESENTED

The primary issue raised by Plaintiff on appeal is that the ALJ erred in determining that Plaintiff could perform his past relevant work. The Plaintiff challenges the ALJ's finding in two ways. First, the Plaintiff asserts that the ALJ's failure to inquire about the physical demands or postural positions of Plaintiff's past work at Plaintiff's hearing is reversible error. Second, Plaintiff asserts that although the ALJ found that Plaintiff's allegations were "generally credible," the ALJ failed to explicitly and properly discredit Plaintiff's testimony when he found that the degree of dysfunction alleged by Plaintiff was disproportionate to the medical evidence in the record. The Commissioner counters that the ALJ did not need specifically to inquire as to the physical demands of Plaintiff's past relevant work at the hearing because Plaintiff had completed various Work History forms detailing his postural requirements, and these forms were contained in the record at the time of the hearing. The Commissioner further asserts that there was substantial evidence in the record to support the ALJ's finding that the Plaintiff's condition was not as limiting as he claimed.

## III.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such

---

[1] *See* 42 U.S.C. § 405(g).

relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff

---

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2003) (All further references to 20 C.F.R. will be to the 2003 version unless otherwise specified.).

unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, she is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[11] Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[12] Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to

---

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). See also Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

demonstrate that "other work" which the claimant can perform currently exists in the

national economy.[15] The Commissioner may satisfy this burden by pointing to the Grids

for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the Grids when "the claimant

has a non-exertional impairment which significantly limits his or her basic work skills or

when the claimant cannot perform a full range of employment at the appropriate level of

exertion."[17] In a situation where both exertional and non-exertional impairments are

found, the ALJ is obligated to make specific findings as to whether they preclude a wide

range of employment.[18]

The ALJ may use the Grids as a framework to evaluate vocational factors so long

as he introduces independent evidence of the existence of jobs in the national economy

that the claimant can perform.[19] Such independent evidence may be introduced by a

vocational expert's testimony, but this is not the exclusive means of introducing such

---

[15] Doughty, 245 F.3d at 1278 n.2.  In Doughty the court explained this burden shifting as follows:
In practice, the burden temporarily shifts at step five to the Commissioner. The
Commissioner must produce evidence that there is other work available in
significant numbers in the national economy that the claimant has the capacity to
perform.  In order to be considered disabled, the claimant must then prove that he is
unable to perform the jobs that the Commissioner lists. The temporary shifting of the
burden to the Commissioner was initiated by the courts, and is not specifically provided
for in the statutes or regulations.) (Internal citations omitted).

[16] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the
Commissioner to show that the claimant can perform other work.").

[17] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996).  See Jones v. Apfel, 190 F.3d 1224, 1229
(11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the
appropriate grid accurately describes the claimant's situation.").

[18] Walker, 826 F.2d at 1003.

[19] Wolfe, 86 F.3d at 1077-78.

evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

## IV. <u>SUMMARY OF THE RECORD</u>

### A.  Personal and Occupational Background

Plaintiff, born on September 17, 1955, was forty-eight years old at the time of the hearing before the ALJ. He had completed high school, but received no further training or education. (R. 87-88.) Plaintiff worked in the trucking industry from February 1983 until his alleged onset date on March 31, 2001, running his own trucking company, Simpson, Inc.,  from 1983-1998, and working for his brother's company from 1999-2001. (R. 76-80, 103, 105, 29-31.) His job required him to complete reports and supervise one hundred to two hundred people. (R. 97, 106.)

As for physical activity in his job, Plaintiff had to walk, stand, sit and write or handle small objects for various amounts of time, but his job did not involve any stooping, kneeling, crouching, crawling, handling of large objects, or lifting objects of any weight. (R. 97, 106.) Because Plaintiff worked for himself, he had a flexible schedule to accommodate his illness, epilepsy, and did not work more than four to six hours a day. (R.103.) While working in the trucking industry, Plaintiff worked in billing, dispatching, as an operations manager, driver, dock worker, in cargo claims, and performed additional administrative duties, as well as owning his own company. (R. 105.) His job involved answering phones, dispatching trucks, talking to customers and

---

[20] *See id.*

6

drivers, attending sales meetings, and negotiating contracts with unions and financing with banks.  (R. 76-80,106.)

## B. Medical Evidence

Plaintiff filed for social security disability alleging epilepsy or seizure disorder, hypertension, and low back pain. (R. 54, 57, 96.) He was treated by a Dr. Troy M. Smith in Michigan and Dr. D. Valay and Dr. B. Mangat (R. 127), as well as various other doctors in Florida, discussed below. (R. 98, 101.) Plaintiff primarily took three medications with the following side effects: Dilantin for his epilepsy, which causes him to be drowsy and tired; Procardia for hypertension, which causes dizziness; and Pravachol for high cholesterol, which causes dryness of mouth. (R. 101, 139.) He also takes Tylenol for pain.  (R. 139.)

### *1. Seizure Disorder*

Plaintiff started having seizures in the 1970s. By 2003, he was taking 500 mg of Dilantin per day to control the seizures, and increases in his medication were noted throughout the record. (R. 88, 127, 137, 201.) The medication causes him to be very tired and drowsy most of the day.  Plaintiff claimed that he sleeps ten to twelve hours every night and four hours during the day. (R. 96, 113, 129.) He also claims the medication affects his ability to concentrate, remember, and think, although Plaintiff can read, write, and perform mathematical computations commensurate with his education. (R. 88.) Plaintiff has not had a seizure since 2001. Before experiencing a seziure he gets very dizzy, sweats, and vomits. A seizure can last from ten minutes to an hour, although during a seizure Plaintiff does not become unconscious. (R. 128, 130.) In June

of 2001, Plaintiff filed a form with the Florida Department of Health stating that in the past six months, he only had one dizzy spell or blackout. (R. 129-130)

In February 2002, Plaintiff was referred by Dr. Valay to Dr. Bhupinder S. Mangat for treatment of his seizures. Dr. Mangat noted that Plaintiff stated his last seizure was five years prior and consisted of generalized convulsions. Plaintiff had been taking Dilantin but was considered to be at a sub-therapeutic dose. Dr. Mangat increased his dose to 400 mg. During his February 2002 appointment with Dr. Mangat, Plaintiff denied any other type of seizure, or staring spells, and also denied having double or blurred vision, numbness, weakness, or paralysis of his arms or legs. (R. 200-201.)

Upon examination, Dr. Mangat noted no weakness in the upper or lower extremities, and that Plaintiff's sensory abilities and gait were normal. Dr. Mangat found no carotid bruits, and noted that Plaintiff's heart sounds were strong, his lungs were clear, and there were no other abnormal findings. Dr. Mangat reported that Plaintiff seemed to be doing "fairly well" and recommended that a serum level be obtained to measure the Dilantin in his system, and that Plaintiff should have an electroencephalogram (EEG) performed. (R. 201, 235-236.) The EEG was performed in March of 2002 with normal results. (R. 216.) Plaintiff's medical records show that he had no complaints of physical illness or impairment other than sleeping for ten hours a day. (R.  217-218, 220.)

### 2. *Back Pain*

In August of 1996, Dr. Troy Smith noted that Plaintiff's lumbar spine showed minimal rotoscoliosis and minimal spondylosis at L5. (R. 169.) Plaintiff claimed to suffer from significant orthopedic problems which affect his head, neck, shoulders, mid and

low back, and extremities, as well as bilateral Carpal Tunnel Syndrome. (R. 88-89.) Plaintiff is allergic to anti-inflammatory medication.  As a result, he can only take Tylenol and use ice packs on his back for pain relief. (R. 89, 115.)

Plaintiff sought treatment from Dr. Tige Buchanan, a chiropractor, for scoliosis, spondylosis, degenerative disc disease, and spurring, which caused moderate neck and back pain that radiated down his arms, and back and neck spasms in 2001-2002. (R. 123, 187-196.) Over the course of his treatment, Plaintiff visited Dr. Buchanan from one to three days a week. Dr. Buchanan also advised Plaintiff to limit his activity,[21] apply cold as needed, and prescribed exercises to address Plaintiff's problems.  During this time period, Plaintiff also began to complain of headaches. (R. 189.) On the Chiropractic Registration form, Plaintiff noted daily sharp pain with aching and stiffness that interfered with his sleep and recreational activities. He also noted that it was difficult for him to lie down, and that he had been experiencing such pain for fifteen to twenty years. (R. 197.) Dr. Buchanan noted decreased motion of Plaintiff's cervical spine, but that Plaintiff was progressing satisfactorily through treatment.

More complaints of back pain were noted by Plaintiff's doctor in October of 2002 (R. 220), and in August of 2002, Plaintiff had an MRI scan of his cervical spine.  That MRI revealed multilevel osteophytic ridging, minimal protrusion at C3-4, protrusion at C5-6, and greater protrusion and ridging at C6-7. (R. 230.) In an MRI scan of the lumbar spine performed at the same time, the radiologist noted that Plaintiff had degenerative disc disease at L5-S1 with bulging and right foraminal encroachment and facet

---

[21] Plaintiff testified that he has not found any physical activity he can do that does not cause him pain.  (R. 50-51.)

degenerative changes at L5-S1.  In September of 2002, Plaintiff had a CT brain scan performed after an abnormal MRI of the cervical spine was revealed. The CT scan revealed "no specific findings . . . to correlate with the patient's known positive clinical findings and symptoms." (R. 228.) In a CT scan of the cervical spine, changes in C6-7 were noted as appearing more problematic with ridging and mild stenosis.  These findings correlated to the MRI that had been performed on Plaintiff in August. (R. 229.)

In August of 2003, Plaintiff was examined by Dr. Lewis J. Herzbrun for his complaints of back and neck pain and pain radiating into his upper and lower extremities.  Dr. Herzbrun's notes disclose that Plaintiff claimed any movement exacerbates the pain, and that he has difficulty sleeping, cannot walk long distances, or change position.  The doctor also noted that Plaintiff complained of frequent headaches, lightheadedness, difficulty with concentration and confusion, and that he became fatigued easily due to his seizure medication.  In addition, Dr. Herzbrun noted that Plaintiff also had a history of poor balance, daytime drowsiness, numbness and tingling in his arms, legs, and occasional blurred vision.[22] (R. 221.)

Upon physical examination, Plaintiff was found to ambulate with an antalgic gait[23] without the need of an assistive device. He had no visible atrophy in the extremities. Strength was 5/5 in all major muscle groups in the upper extremities with the exception

---

[22] Plaintiff also testified that his blurred vision was one of the reasons his brother dismissed him from his job performing clerical work for his brother's trucking company.  (R. 29, 31.)

[23] An antalgic gait or antalgic limp is a change in the normal gait of a person used to avoid pain in the lower extremity that is secondary to another condition.  "An impairment rating due to a gait derangement should be supported by pathological findings, such as x-rays," but an antalgic gait often is considered a 7 percent whole-person impairment.  2-7 Attorneys' Textbook of Medicine P 7.150, P. 7.152, Gait Derangement (3d ed. 2005.)

in the right wrist extensors which received a score of 4-4+/5. There was slight decreased sensation in the first finger on Plaintiff's right hand, but otherwise sensation was in tact.  Dr. Herzbrun noted that Plaintiff appeared to have thoracolumbar scoliosis and was limited in his range for lumbar flexion, extension, and lateral bending. Upon performance of an EMG/NCS test, Plaintiff was found to have an abnormal electrophysiologic study consistent with right C6 radiculopathy.[24] Dr. Herzbrun concurred with the care and chiropractic treatment Plaintiff was receiving and noted that his medication options for the pain were quite limited due to Plaintiff's allergies to anti-inflammatory drugs and drowsiness caused by his anti-seizure medication which would only be worsened by stronger pain medications. (R. 222.) The doctor noted that there was no evidence of active or ongoing denervation. He also diagnosed the Plaintiff with mild bilateral carpal tunnel syndrome. (R. 223.) There was no evidence of lumbar radiculopathy, peripheral polyneuropathy or focal monosuropathy, and no myopathic findings. (R. 223-227.)

On March 23, 2004, Dr. James Ryan performed a consultative physical exam. Upon examination, Dr. Ryan found that Plaintiff had a normal gait, but limited range of his cervical and lumbar spine on flexion and extension, as well in lateral bending and rotation. Dr. Ryan found that Plaintiff had full shoulder, elbow, and wrist motion with excellent grip strength. Dr. Ryan noted that Plaintiff also had full hip and knee range of motion and does not need an assistive device to walk. He did not detect any motor

---

[24] "Pain due to a C6 and C7 radiculopathy radiates from the neck and from around the shoulder into outer aspect of the arm and forearm. C6 radiculopathy may cause pain and numbness along the dorsal aspect of the thumb and index finger."  Neuroscience Resource Page, Radiculopathies, at http://www.neuroanatomy.wisc.edu/SClinic/Radiculo/Radiculopathy.htm (last available February 27, 2006).

weakness or sensory loss in Plaintiff's lower extremities. Dr. Ryan noted that Plaintiff had good grip strength and normal fine manipulation. He noted that from the lumbar spine x-rays, there was evidence that Plaintiff had only mild degenerative changes. In his evaluation of Plaintiff's MRI from August of 2002 he made similar findings to those of the radiologist and Dr. Herzbrun. Dr. Ryan found that Plaintiff had degenerative disc disease of the cervical and lumbar spine with no neurological deficits. (R. 241.) Based on this exam, he concluded that Plaintiff could perform light to moderate duty work with no repetitive lifting or bending. (R. 242.)

### 3. *Agency RFC Assessments and Medical Source Statements*

Dr. Jim Takach, an agency physician completed an assessment of Plaintiff on July 18, 2001.  He found that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk for about six hours in an eight- hour workday, sit for about six hours in an eight-hour workday and had unlimited upper and lower extremity ability to push and/or pull objects.  Dr. Takach's assessment included postural limitations that Plaintiff should never engage in climbing ladders/ropes/scaffolds, and only occasionally engage in climbing ramps/stairs, balancing, stooping, kneeling, crouching, or crawling. (R. 176.) With respect to environmental limitations, Dr.  Takach noted that Plaintiff should avoid concentrated exposure to extreme cold or extreme heat and moderate exposure to fumes, odors, dusts, etc., and hazards. (R. 178.) A medical consultant agreed with the agency physician's findings of Plaintiff's limitations. (R. 182-186.)

On May 7, 2002 the agency physician Dr. James Green completed a second agency RFC assessment. The only difference between the first and the second

assessment was that Dr. Green found that the Plaintiff occasionally could lift fifty pounds and frequently lift twenty-five pounds. Dr. Green noted that the Plaintiff had not had a seizure in five years and that Plaintiff has mild back pain which is being treated by a chiropractor. Dr. Green did note that Plaintiff was restricted from heavy lifting, although no limitations of any other sort were noted.

In August of 2003, Plaintiff's chiropractor, Dr. Buchanan completed a medical source statement of Plaintiff's ability to do physical activity. He noted that Plaintiff could not lift more than twenty pounds occasionally and ten pounds frequently. He also noted that Plaintiff could walk and/or stand for at least two hours in an eight-hour workday (R. 232), that Plaintiff had to alternate sitting with standing to relieve pain and discomfort, and that he was limited in pushing and/or pulling abilities in his upper and lower extremities. Dr. Buchanan made these assessments based on the findings in the MRI discussed above. (R. 233.) Dr. Buchanan noted that with respect to postural limitations, Plaintiff should never climb ramps, stairs, ladders, ropes, or scaffolds, and that Plaintiff should only occasionally engage in activities that require balancing, kneeling, crouching, or crawling. Dr. Buchanan noted that Plaintiff's reaching abilities were limited,[25] but that Plaintiff had no other manipulative limitations or visual/communication limitations. Dr. Buchanan did note that Plaintiff should avoid operating machinery, but that there were no other environmental limitations. (R. 234.)

On November 4, 2003, Dr. Valay also completed a medical source statement but noted that his responses were "per patient" as to Plaintiff's ability to lift and carry, stand

---

[25] Plaintiff testified that he cannot reach his arms over his head due to his neck problems. (R. 50-51.)

and/or walk, and sit. He did note that Plaintiff had limitations in his upper extremity ability to push and pull due to pain and as supported by the MRI and CT scans. He noted that Plaintiff had postural limitations and should never be required to climb, balance, kneel, crouch, or crawl. (R. 238.) Dr. Valay noted that Plaintiff had slight manipulative limitations in his ability to a finger an object between the third through fifth fingers of his right hand. (R. 239.) Lastly, Dr. Valay noted that Plaintiff should be limited in his environmental exposure to vibrations and thus Plaintiff would be limited in his ability to move a lawn mower or vacuum cleaner. (R. 239.)

In a Medical Source Statement, Dr. Ryan noted that Plaintiff occasionally could lift fifty pounds, frequently lift twenty pounds, and stand or walk for about six hours in an eight-hour workday. He also noted that Plaintiff's impairments did not affect his ability to sit or push and pull, though Plaintiff had occasional limitations on all postural activities. (R. 246.) Dr. Ryan disclosed no other limitations. (R. 247-248.)

## V. DISCUSSION

### A. Analysis of the Demands of Plaintiff's Past Relevant Work

Plaintiff contends that the ALJ was required specifically to question the Plaintiff at the hearing with regard to the demands of Plaintiff's past relevant work. According to Plaintiff, the ALJ cannot solely rely upon the Work History submitted by the claimant.

In a social security proceeding, it is the responsibility of the ALJ to weigh all of the evidence in the record, including medical opinions, medical tests, documents submitted by the Plaintiff to the Social Security Administration and the testimony of the Plaintiff. The Plaintiff, of course, has the burden of proving his disability and the inability

14

to perform his past relevant work by offering evidence into the record.[26] The ALJ only has a duty to develop the record further or acquire additional information where there is not sufficient evidence in the record to determine whether the Plaintiff is disabled.[27]

The Plaintiff argues that the ALJ erred by failing to determine if the Plaintiff's past work required him to lift, carry, climb, stoop, kneel, crouch, crawl, or engage in repetitive bending. There was evidence of record on each of these functional abilities. Specifically, in the Work History forms filled out and completed by Plaintiff (R. 97, 106), Plaintiff represented that his past relevant work did not require him to climb, stoop, kneel, crouch, crawl, nor lift objects of any significant weight.[28] In determining Plaintiff's RFC the ALJ found that Plaintiff should not engage in repetitive bending, and only occasionally be required to balance, crawl, climb, or kneel. The RFC also reflects a finding that Plaintiff should not lift or carry more than ten pounds frequently, and could lift up to twenty pounds only occasionally.

Accordingly, because the physical demands of Plaintiff's past work did not require him to lift anything, engage in repetitive bending, nor assume any other postural

---

[26] 20 C.F.R. § 404.1512.

[27] *See* 20 C.F.R. §404.1527(c)(3).

[28] Such a description of Plaintiff's prior work activities is consistent with the definition of Operations Manager in the Motor Transportation industry as described in the Dictionary of Occupational Titles. According to that definition, an operations manager, "[d]irects and coordinates activities of workers engaged in crating, moving, and storing . . . goods . . . Inspects warehouse facilities and equipment and recommends changes in allocation of space, and crating procedures . . . .Purchase moving equipment . . . Plans pickup and delivery schedules. . . .Answers such inquiries as type of service offered, rates, schedules, and areas serviced.  Examines items to be moved . . . . Investigates customers' complaints . . . Interviews, selects, trains, and assigns new personnel. . . . " The strength requirement for such work is described as light work and it was noted that one who engages in this kind of work does not need to be able to climb, balance, stoop, kneel, crouch, or crawl.  Dictionary of Occupational Titles §184.167-118 (4th ed. 1991).

positions these limitations were well below Plaintiff's RFC as determined by the ALJ. The ALJ was not required to make further inquiry about the physical demands of Plaintiff's past relevant work at the hearing because there was substantial evidence in the record establishing those demands, and the ALJ properly found that Plaintiff's RFC would not preclude him from meeting the physical demands of his past relevant work.

Additionally, because the demands and job duties of Plaintiff's occupation as generally performed in the national economy (as opposed to the demands of Plaintiff's past relevant work as he performed it) has exertional requirements consistent with Plaintiff's RFC the ALJ did not err, even if the ALJ should have made further inquiry into the particular demands of Plaintiff's past relevant work. Either way the ALJ did not err.

B. **Credibility of Plaintiff's Testimony**

Without much detailed analysis or discussion in his brief, Plaintiff suggests that the ALJ improperly discredited his testimony. However, the ALJ did not completely discredit Plaintiff's testimony. Rather, the ALJ found that "although the claimant's allegations are found to be generally credible, the degree of dysfunction alleged is disproportionate to the objective medical findings and the opinions of the physicians."

While Plaintiff suffered from some back problems and had epilepsy, there was not substantial evidence in the record to establish that these conditions prevented Plaintiff from performing his past relevant work. To the contrary the medical evidence did not suggest that these conditions impacted his ability to perform past relevant work. As discussed above, Plaintiff had not had a seizure since 2001, and prior to that Plaintiff had not had a seizure since 1997. Further, Plaintiff's epilepsy was well controlled by the medication Dilantin. With regard to back problems, Dr. Mangat did not note any

16

abnormality in Plaintiff's upper and lower extremity strength or with his gait. (R. 201, 235-236.)

In addition, Plaintiff received only conservative treatment for his back problems and Dr. Herzbrun found that his strength was 5/5 in all major muscle groups and 4-4+/5 with respect to his right wrist extensors. Although Dr. Herzburn and Dr. Ryan both found some limitation in the range of motion of Plaintiff's back and an MRI revealed some ridging, protrusions, mild stenosis, and degenerative disc disease, none of the doctors noted any significant limitations on Plaintiff's activities due to these conditions. The ALJ noted that he gave particular weight to the opinions of the State Agency physicians and consultative examiner Dr. Ryan "in light of their consistency with each other as well as the body of evidence contained in the medical records." The ALJ's evaluation of the opinion evidence was consistent with agency regulations[29] and was analyzed in light of all of the evidence in the record.

In finding that the Plaintiff's subjective complaints were generally credible, the ALJ acknowledged that mild pain and fatigue[30] were likely side effects of his conditions. However, the ALJ properly analyzed the medical evidence in the record in concluding that while Plaintiff's testimony was generally credible, the degree of dysfunction alleged

[29] *See* 20 C.F.R. § 404.1527.

[30] In one sentence in Plaintiff's brief he mentions that his medication made him drowsy and he could not work more than five to six hours a day because he needed to rest. According to Plaintiff, the ALJ failed to consider this limitation in Plaintiff's RFC or in determining whether Plaintiff could perform his past relevant work. However, Plaintiff's complaints of drowsiness and his consequent inability to work a full day were in no way supported by the medical evidence in the record.  Plaintiff's doctors noted his complaints of fatigue, but nonetheless, raised the dosage of his medication, which caused his seizures to continue to remain well-controlled. There is no evidence in the record that suggests Plaintiff's epilepsy impacted his ability to perform basic work or daily living activities. Notably, in the medical records of Plaintiff's own doctors, none of the doctors opined or concluded that Plaintiff was unable to work a full day because of epilepsy or because of drowsiness from the medication he was taking.

by Plaintiff is disproportionate to the medical evidence and opinions of the physicians of record. Accordingly, the Court concludes that there was substantial evidence to support the ALJ's conclusion that Plaintiff was not disabled.

## VI. <u>CONCLUSION</u>

In view of the foregoing, it is hereby **ORDERED** that the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter judgment accordingly and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on February 28, 2006.

GARY R. JONES
United States Magistrate Judge

Copies to:
    All Counsel